UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA | : | CRIM. NO. 3:02CR7(JBA) |
|---|---|---|
| VS. | : | |
| FAUSTO GONZALEZ | : | JULY 18, 2005 |

**MEMORANDUM IN SUPPORT OF MOTION FOR NEW TRIAL.**

The Defendant, Fausto Gonzalez, hereby submits this memorandum in support of the motion for a new trial dated January 28, 2005, previously filed in this matter.

**A highlight of the trial from the defense perspective.**

Mr. Gonzalez was charged with the May 24, 1996 murder of Teddy Casiano. Mr. Casiano was shot to death by an individual riding on the back of a motorcycle. Teddy Casiano had, prior to being murdered, kidnapped Ollie Berrios and stolen drugs and money from Mr. Berrios. In fact, Teddy Casiano humiliated Ollie Berrios during the kidnapping. (Transcript of October 6, 2004 p. 569). Mr. Berrios worked for Wil Perez in the drug distribution business. Mr. Berrios, Jay Feliciano and Mario Lopez all testified at trial that they were involved in the retaliatory murder of Mr. Casiano but that Fausto Gonzalez, while riding on the back of a lime green and white motorcycle was the individual who actually shot and killed Teddy Casiano. Mr. Gonzalez's defense at trial was essentially two fold: (1.) that he did not fit the physical description of the person on the back of the motorcycle who shot Teddy Casiano; and, (2.) that in light of the fact that he did not meet the physical description of the shooter there was a reasonable doubt about his guilt despite the testimony of the cooperators. The case against Fausto Gonzalez was

1

built completely on the testimony of cooperating witnesses. As the Supreme Court recognized in Williamson v. United States, 512 U.S. 594, 599-600 (1994), "one of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature."

Ollie Berrios had the motive to kill Casiano. (Transcript of October 5, 2004 p. 336) A motorcycle sold by Mario Lopez to Mr. Berrios was seized by the Hartford Police soon after Casiano's murder. The headlights on Mr. Berrios's motorcycle matched the description of the motorcycle used in the Casiano killing according to eye witness Michael Pinheiro's testimony at trial. Mr. Berrios's motorcycle was tested after being seized and had Mr. Berrios's prints and gun shot residue on it. The defense argued that Mr. Berrios, a drug dealer, in conjunction with Wil Perez, enlisted his friend and drug associate, Jay Feliciano and Mario Lopez to help him kill Mr. Casiano. Somewhere intertwined in Mr. Berrios's plan to kill Casiano lurked a drug connection with Ricky Ruiz from the pizza shop in the Bronx. The defense tried to present that Fausto Gonzalez was a car and motorcycle thief, not a drug dealer, and an outstanding motorcycle rider, but that it made little sense that he would go all the way to Hartford, Connecticut for a contract murder for only five ($5,000) or six ($6,000) thousand dollars.

**Trial Testimony concerning the description of the shooter.**

Gonzalo Morillo testified that on the day that Teddy Casiano was murdered he recalled seeing three people at Wil Perez's garage around a green motorcycle. He recognized one of the men as Ollie Berrios, but did not recognize the other two men. (Transcript of 10/4/2004 p. 140) He did remember that the two men he did not know were darker skinned than he was. (id. at p. 146). Mr. Morillo was not asked to

2

acknowledge that Fausto Gonzalez was lighter skinned than he and not one of the other two men.

David Hannon testified that he was eating lunch in his truck when Mr. Casiano was killed. Mr. Hannon told the jury that he heard a shot first, then looked up, and at that point was able to observe the passenger on the back of the motorcycle lean over the back of the driver, square his body and shoot Mr. Casiano with his right hand. (id. at p. 157-158). Mr. Hannon further told the jury that the driver of the motorcycle and the shooter "were dark skinned." (id. at p. 160). Mr. Hannon was the only eye witness who testified that the shooter used his right hand. Mr. Hannon was not asked by the government to identify Fausto Gonzalez as one of the dark skinned killers.

Unfortunately for Mr. Gonzalez, the jury only heard a trial deposition from Michael Pinheiro, who was the defense's most important witness. Mr. Pinheiro was in his car and observed the shooting of Teddy Casiano. As he was making a turn at the intersection, Mr. Pinheiro observed in his rearview mirror the person on the back of the motorcycle pull a gun from the front of him and begin shooting. He was about 10 feet from the shooting. (Transcript of 9/23/2004 p. 11). Mr. Pinheiro then pulled off to the side of the road, stopped, and proceeded to look back directly at the shooting without having to use the rear view mirror. He was able to observe shell casings coming from the gun. ( id. at p. 8). The motorcycle, with the killers, then sped past him. Mr. Pinheiro hit his accelerator and with tires squealing tried to catch up to the motorcycle. At this point "the guy in the back of the bike looked back at me." (id.) Mr. Pinheiro described the shooter as thinly built, lightly muscular, defined like Bruce Lee. The shooter had olive skin, thick black haired eyebrows, a moustache and Mediterranean sunken eyes. The

3

shooter used his left hand to do the shooting.  Mr. Pinheiro testified that the motorcycle [like the motorcycle sold by Mario Lopez to Ollie Berrios] had "two front orbital headlights." (id at p. 15).  Mr. Pinheiro was asked by Mr. Ring about a photo of an individual he could not identify as the shooter, but he was not specifically asked by either attorney at the deposition if he could identify Fausto Gonzalez as the shooter.  Mr. Pinheiro did not describe Fausto Gonzalez as olive skinned.  Mr. Pinheiro did not describe Fausto Gonzalez as "defined" like Bruce Lee.

    Miriam Oquendo was also an eye witness to the murder.  She testified that the shooter used his left hand to do the shooting.  (Transcript of October 5, 2004 p. 216.)  Her testimony about the use of the left hand was consistent with what she told the police at the scene, and with what she told the grand jury. (id. at p. 221).  Ms. Oquendo was not asked if she could identify Fausto Gonzalez as the shooter.

    Lori Gallo was another eye witness who did not actually appear in person in front of the jury.  In fact, her testimony was read not by a female, but by AUSA Vatti.  Ms. Gallo's testimony was that the shooter used his left hand. (id. at p. 224).  The shooter was "olive complected" and was skinny but "had muscle definition." (id. at p. 230).  Since Ms. Gallo's testimony was from a grand jury proceeding, she was not asked if Fausto Gonzalez was the "olive complected" shooter.

    Mario Lopez was left handed.  (Transcript of October 7, 2004 p. 831).  The undisputed trial testimony of where and how the driver of the motorcycle maneuvered the motorcycle to do the shooting indicated that the driver positioned the motorcycle in such a way as to favor a left handed shooter not a right handed shooter.  However, the government managed to bolster the credibility of its case-in chief that Fausto Gonzalez

4

was the shooter even though he was right handed with the following highly prejudicial, irrelevant, baseless testimony from DEA Agent Matta, introduced without any objection by the defense:

> Q. Did you ever shoot -- what hand are you, right handed or left handed?
>
> A. [Agent Matta] I'm right handed.
>
> Q. Ever shoot with your left hand?
>
> A. Yes.
>
> Q. Ever had a problem hitting a target six inches away with your left hand?
>
> A. No. (Transcript of October 12, 2004 p. 1209).

It appears to the undersigned that the jury should have seen and found that Mr. Gonzalez was a right handed, fair skinned [absolutely not olive or dark skinned] light brown haired, medium to thin built individual not "defined" like Bruce Lee, who had a prominent chipped tooth. (Transcript of October 5, 2004 p. 323).

**The connections between Ollie Berrios, Ricky Ruiz, Mario Lopez, Jay Feliciano and Alejandro Valentin prior to and after the murder of Teddy Casiano.**

Ollie Berrios was acquainted with Ricky Ruiz before Teddy Casiano was murdered. (Transcript of October 6, 2004, p.545, 578). Berrios and Ruiz were involved in drug trafficking together before Casiano was killed. (id. p. 579). Mario Lopez stole cars and motorcycles at gun point for a living and was acquainted with Ricky Ruiz before Casiano was murdered. Mr. Lopez stole the motorcycle he ultimately sold to Mr. Berrios in February of 1996 after seeing it at the Javits Center. At some point in time Mario Lopez sold the stolen purple, white and lime green Honda motorcycle to Ollie Berrios. (Transcript of October 7, 2004 p.880). The jury could have easily found that Mario

5

Lopez sold the motorcycle to Ollie Berrios well before Teddy Casiano was killed. (Trial transcript October 12, 2004 p. 1131 and before.). As noted above, the motorcycle that Mario Lopez sold to Ollie Berrios was seized by the Hartford Police soon after the murder and had gun powder residue on it and Berrios's finger prints. (Transcript of October 6, 2004, p. 567). The motorcycle sold by Lopez to Berrios also had two front headlights (Transcript of October 12, 2004, p. 1043), just like the motorcycle used in the murder of Teddy Casiano, according to the eye witness account of Michael Pinheiro.

Prior to Casiano's murder, Jay Feliciano was selling drugs supplied to him by Ricky Ruiz. He also stole motorcycles. (Transcript of October 5, 2004, p.245-246). Feliciano also obtained drugs from Ollie Berrios. (id. p. 250).

After Teddy Casiano was killed, in the summer of 1996 Ollie Berrios was released from jail and was not incarcerated again until his arrest in 1998. During that time, Ollie Berrios was in New York and associated with Mario Lopez. (Transcript of October 6, 2004, p. 592). During some of that same time after Casiano was murdered that Berrios and Lopez were together, Mario Lopez was stealing motorcycles and cars with Alejandro Valentin. (Transcript of October 12, 2004, p. 1105). This connection in time between Mario Lopez and Alejandro Valentin might have cast doubt on Valentin's testimony of admissions to this murder by Fausto Gonzalez while they were on the street in 1999. Furthermore, Valentin described Fausto Gonzalez as blond and made no mention of the prominent chipped tooth Fausto Gonzalez has had since he was young.

The first business day after the murder of Teddy Casiano, Ricky Ruiz, Mario Lopez, Ollie Berrios and perhaps Jay Feliciano went from New York to Hartford to buy a new SRAD motorcycle. Ruiz paid for the motorcycle in cash. Ollie Berrios used his

6

Connecticut address to obtain insurance. In Agent Matta's report of July 11, 2001, Agent Matta reported that Mario Lopez told him that "Ruiz purchased the bike for Lopez." (Transcript of October 7, 2004, p. 890.) Fausto Gonzalez did not go to Hartford with Ricky Ruiz, Ollie Berrios or Mario Lopez to purchase the SRAD motorcycle after the Casiano. If Fausto Gonzalez was paid to kill Teddy Casiano, why was he not involved in the SRAD purchase?

**Argument in support of a new trial under Rule 33.**

It is and was the government's belief that Fausto Gonzalez is a killer and had committed other murders before he killed Teddy Casiano, for example, that Fausto Gonzalez killed Edwin Roas, Jose Munoz, and others. Prior to trial, the government indicated to counsel for Fausto Gonzalez that it intended to introduce evidence of the murder of Jose Munoz against Mr. Gonzalez under Fed. R. Evidence 404(b). In response to the government's intent to introduce evidence of the prior uncharged murder of Jose Munoz, counsel for Mr. Gonzalez filed a motion in limine, with supporting memorandum, dated August 30, 2004, asking the Court to exclude evidence of other **alleged unadjudicated** murders at trial. Although a response in opposition to Mr. Gonzalez's motion in limine was filed, the government ultimately represented that it would not seek to introduce evidence regarding the murder of Jose Munoz in its case-in-chief against Fausto Gonzalez. (See the Court's Endorsement Order DOC 11581 dated September 15, 2004).

The result of the defendant's motion in limine and the government's representation, was that Fausto Gonzalez's trial as to whether he was guilty or not guilty of killing Teddy Casiano should not have been infected in any manner with claims,

7

allegations or innuendos concerning prior unadjudicated murders that the government believed he had, in fact, committed.

**Argument One.**

    1. The Court committed harmful reversible error by ruling that the defense opened the door to questioning by the government on re-direct examination of Jay Feliciano concerning Fausto Gonzalez bragging about having committed prior unadjudicated murders.

    Alternatively, if the Court finds that its ruling was correct, Mr. Gonzalez's trial attorney, Attorney Casale, provided ineffective assistance of counsel in his cross-examination of Jay Feliciano by asking questions that, in effect, opened the door to the introduction of testimony that Fausto Gonzalez bragged about committing prior murders.

    Mr. Feliciano's testimony that Fausto Gonzalez bragged about committing other murders before the Casiano murder should never have been a part of the trial. It is our respectful position that the introduction of this testimony from Jay Feliciano that Fausto Gonzalez bragged about committing other murders, before the Teddy Casiano killing, given the facts of this case, was the main or substantial reason the jury returned a guilty verdict.

    In our view, due to the government's belief that Fausto Gonzalez was and is a killer, the government, even during jury *voir dire* was extremely sensitive to the defense presenting Mr. Gonzalez as not being "involved in the crime here because he's just a car thief and these other people are violent people." (Transcript of September 22, 2004 p. 677-678). The following transpired during *voir dire*:

THE COURT: Let me ask you this, how is the defendant's prior record coming in?

MS. SADIN: It may. I think that during the – during testimony of the cooperating witnesses it may become evident, and we are not clear that it's anything we want to hide from the jury.

MR. RING: Well, we're going to – that's going to create an issue, Judge.

MS. SADIN: And I don't care to tell this juror that. I want to know. I want to know whether this juror can consider mitigation for – only someone who has never been convicted of anything before.

MR. RING: I'll just flag for the Court, the kind of selective exposure of the defendant's criminal past, we're getting into that 404(b) issue that I flagged, and I'm just going to leave it at that for now.

THE COURT: I mean, I don't have anything before me.

MR. RING: I don't either.

MS. SADIN: I do agree – I'm sorry, I agree with Mr. Ring, I don't think it's time to take it up now, but I think we should before the trial. I agree with that.

MR. RING: My concern would be, you know, this guy wasn't involved in the crime here because he's just a car thief and these other people are violent people. That's where we're getting into problems, Judge.

MS. SADIN: Well, I agree that it should be addressed before evidence.

THE COURT: All right, somebody frame it up in the form of a motion, please.

MS. SADIN: We've already filed that. I think that the motion in limine addressed, I hope it did, I tried to make it address all those issues, and I think that given

the fact that the government was not going to seek to introduce the Munoz murder in its case-in-chief as 404(b), the Court had denied as moot with the opportunity to renew. I wouldn't be saying anything different. I think I raised everything in that motion in limine.

**MR. RING: I'm going to wait and see if they open the door, Judge.** [emphasis added](Transcript of September 22, 2004 p. 676-678).

It is clear from the above exchange that the defense position or argument in this trial that Fausto Gonzalez was only a car and motorcycle thief and not a killer bothered and worried the government. The government did not retract its representation about other uncharged murders, but it clearly put the court and defense counsel on notice that if the door was opened in any way by the defense, the government would not then just sit on its hands, but seek to take advantage of the situation.

The first cooperating witness called by the government was Jay Feliciano. The government questioned Mr. Feliciano in pertinent part as follows:

A. He [Ollie Berrios] said if I knew anyone who'd kill Teddy.

Q. And what did you say in response?

A. Yes, I know somebody.

Q. And what did you tell him that you might do?

A. Go down and talk with them.

Q. All right. And what I'd like to do – was that the extent of the conversation, this first conversation we have been talking about? Is that pretty much it, what was said?

A. Yes.

10

Q. Did you do anything? Did you go anywhere after having that conversation with Ollie?

A. One time – yes, I went down to New York. I was there at one time.

Q. And when you say down in New York, where were you?

A. At the pizza shop, Cubanito.

Q. And were you there on this occasion for a specific purpose, or did you just happen to be there?

A. No, I was there.

Q. Did you see anybody when you were there?

A. Yes, I seen Fausto.

Q. Did you speak to him?

A. Yes.

Q. Why don't you tell us what was said.

A. I said "some guys up in Connecticut need you to do a job."

Q. And by "job," what did you mean?

A. Killing somebody.

Q. And what did he say?

A. He said "when."

Q. I'm sorry?

A. "When."

Q. "When?"

A. Yes.

Q. And what did you understand him to mean when he said that?

11

A. Whenever. He was ready……..

Q. And at the time you approached Fausto and had this conversation with him, did you know who he was? In other words, had you met before?

A. Yes sir.

Q. And were you friends with him, or was this just another hi, bye thing?

A. Hi-bye thing. (Transcript of October 5, 2004 p. 257-259, direct examination).

Based upon how this issue was specifically "opened up" by the government itself, cross-examination of Mr. Felicano proceeded as follows:

Q. Now, Fausto, never a friend of yours right?

A. It's a hi and bye thing, yeah.

Q. Sorry?

A. It was a hi and bye thing, yeah.

Q. So, not even an acquaintance of yours, right?

A. No sir.

Q. Hi, bye? And he wasn't involved in any drug selling with you?

A. No, sir.

Q. Wasn't involved in any stolen motorcycles with you?

A. No sir.

Q. You understood he had his own stolen motorcycle thing?

A. Yes sir.

Q. Now, it's true then you really didn't know him at all?

A. I knew him by talk.

Q. Yeah, from the neighborhood, from the pizza place?

12

A. Yes, sir.

Q. Right, you never hung out with him?

A. No, sir.

Q. Did you know if he was married?

A. No. I knew he had a wife, but I don't know if he was married.

Q. Did you know if he had any kids?

A. Yes.

Q. How about if he had any health problems, anything like that?

A. No, sir.

Q. You didn't know anything about that, right? You didn't know if he was out on bond on an arrest, nothing like that?

A. No, sir.

Q. So your story is that you approached a guy you hardly knew to go kill a guy in Connecticut and his only response to you was "When?"

A. Yes, sir.

Q. Okay. And there was no further conversation at that point?

A. No, sir.

Q. And you went back to Connecticut?

A. Yes, sir. (Transcript of October 5, 2004 p. 318-320).

Based upon this cross-examination, the government argued that it was "surprised" that questions were asked "about when he first met Fausto for the purpose of discussing the murder." (id. p. 368). Mr. Ring argued to the Court that "my recollection of the questions is that he asked him 'you didn't know Fausto at the time, you didn't have a

13

relationship, and its your testimony you approached this guy that you knew -- excuse me, I'm losing my ability to read this.' 'You approached this guy that you didn't even know and his only response was 'when.'" Mr. Casale has left the jury with the impression that it's completely implausible that Jay would have gone to Fausto under these circumstances." I don't know how I can respond to that other than by asking this witness, "Well, why did you go to this guy that you didn't know." (id. p. 368-369).

The government's argument was meritless, because it was the government itself that "opened the door" by the questions in its direct examination that elicited the response from Mr. Feliciano that all Fausto said, when asked to go to Connecticut to kill somebody was "when." (id. p. 258 lines 10 to 23). Furthermore, it is our view, that based upon the record, the government's argument lacked credibility. Base upon the statement by Mr. Ring himself during jury *voir dire* on September 22, 2004 at page 678, it is our view that the government was not surprised but essentially laying in wait so that it could, in effect, force the door open to be able to admit testimony concerning prior murders.

As a result of Mr. Ring's claim, there was lengthy argument concerning this issue. (id. p. 369-378, 381-387). The Court agreed with Mr. Ring despite the various objections set forth by the defense and the defense's specific objection under Rule 403. (id. p.387). As a result of the Court's ruling the government was permitted to elicit the following on re-direct examination:

Q. What I'd like to do is I'd like to go back to that first conversation you had with Fausto Gonzalez in the pizza place in which you asked him about the murder. Do you understand the conversation I'm asking about?

A. Yes, sir.

14

Q. Okay. The question I have for you is when you were at the pizza place, you then went to talk to Fausto and asked him to do the job. Why is it that you chose to go to him and ask him whether he would do the job?

A. **Because he was always bragging about murders.** [emphasis added]

Q. And was he bragging about the murders himself.

A. Yes.

Q. Meaning?

A. Yes, him and – him and --

Q. All right, that's fine. And that's why you chose to go to him, right?

A. Yes, sir. (id. p. 403-404).

The government capitalized on this testimony from redirect examination in its initial closing argument:

"Now, you also heard what else was happening at that restaurant. You heard from Fat Jay, how when he was going down there he heard the defendant brag about committing murders. And you heard, ladies and gentlemen, that as a result of that, when he was looking for a killer, he went to the pizza place. And you heard that as a result of that, when he went to the pizza place, he found the killer, the defendant in this case, Fausto Gonzalez. (Transcript of October 13, 2004, p. 1253).

The government further capitalized on this testimony in its rebuttal closing argument:

Mr. Casale says he'd have to be stupid. Maybe he was. He was bragging about murders before. That's what got Santiago Feliciano into the bar looking for him in the first place. (id. p. 1325).

15

The "opening the door" doctrine is not codified in the Federal Rules of Evidence. Tait's Handbook of Connecticut Evidence, Third Edition, section 1.32.3 defines it as follows:

A party who initiates discussion of an issue, whether on direct or cross-examination, is said to have "opened the door" to inquiry by the opposing party.

In this situation, the record clearly reflects that the government, not the defense, in fact "opened the door" to inquiry concerning the hi-bye nature of the relationship between Mr. Feliciano and Fausto Gonzalez by its direct examination set forth above. The government elicited the **"when"** response by Mr. Feliciano in the first place. Mr. Casale's questions did nothing more than reiterate what the government did on direct examination. Even if, however, the Court believes that the defense did "open the door," and gain some further advantage in the eyes and ears of the jury above what the jury already knew from direct examination, the defense questions did not give the government the right to respond on re-direct examination with the extremely prejudicial testimony from Mr. Feliciano concerning other murders. cf. United States v. Rosado, 728 F. 2d 89, 95 (2nd Cir. 1983). In short, a small advantage improperly obtained does not compel the exaction of a gross disadvantage in penalty, particularly where a tarnished verdict is the inevitable result. United States v. Beno, 324 F. 2d 582, 588-589 (2nd Cir. 1963). The following language used by the Second Circuit years ago in Beno is instructive in this case: "that past crimes be of a similar nature before they are admissible on the issue of intent gives effect to one of the most fundamental notions known to our law – that a man is entitled to be tried only for the specific charges explicitly stated and

16

should not be compelled to defend a lifetime of conduct. <u>United States v. Beno,</u> supra. at 587; quoting McCormick on Evidence, 1954, section 157.

In the present case, Fausto Gonzalez was on trial for killing Teddy Casiano on May 24, 1996. He was not on trial for the prior unadjudicated murders the government believes he committed. The Court erred, on this record, by permitting the government under the door opening doctrine to elicit testimony from Jay Feliciano concerning Mr. Gonzalez's alleged admission that he had committed murders before the Casiano murder.

Alternatively, defense counsel was ineffective in "opening the door" to the other murders testimony of Mr. Feliciano. During the legal argument on this issue the following transpired:

MS. SADIN: If I may, Your Honor, I don't think that it goes beyond what the government's direct was in certain ways because effectively the government was asking that question.

THE COURT: No, but that's where you are wrong because if it was stopped at "so you just had a hi-bye relationship with him, you weren't involved with him," then we would be fine. But then it goes on to say in a very argumentative or rhetorical fashion, something that would normally be expected to be in closing argument. (Transcript of October 5, 2004 p. 376). It is our position that this statement by the Court supports our position that counsel was ineffective in asking one or a couple of questions to many and thereby opened up the door to a devasting re-direct examination. As the Court noted, defense counsel should have asked a limited follow-up to the government's direct and left the issue until closing argument.

Counsel's cross-examination was ineffective. This was a close case of whether Fausto Gonzalez was the shooter or not. The jury could have gone either way based on their consideration of the issue of whether the shooter was right handed or left handed, the issue of the physical description of the shooter, the issue of whether Mario Lopez sold the motorcycle with gun powder residue on it to Ollie Berrios before the Casiano murder, the issue of why Fausto Gonzalez was not involved in the cash purchase of a new SRAD motorcycle by Ricky Ruiz, Ollie Berrios and Mario Lopez in Hartford the first business day after the Casiano murder. However, the admission of Jay Feliciano's testimony concerning other prior unadjudicated murders along with the highly prejudicial testimony. of Agent Matta that he personally would have had no problem shooting and killing a man from six inches away with his left hand, even though he was right handed, led to a guilty verdict. In the interests of justice a new trial should be ordered.

**Argument Two.**

Mr. Gonzalez incorporates each and every argument set forth in paragraphs 12 (a) through 12 (o) of his motion for a new trial dated January 28, 2005. Mr. Gonzalez further incorporates each and every legal memorandum and argument by counsel during *voir dire* and trial in support of the arguments set forth in paragraphs 12(a) through 12(o).

For the foregoing reasons, either alone or cumulatively, Mr. Gonzalez was denied a fair trial. WHEREFORE, in the interests of justice, the convictions in this case should be vacated and a new trial ordered.

18

          Respectfully submitted,


          By_____
          William T. Koch, Jr. Fed Bar ct#04781
          151 Brush Hill Road
          Lyme, CT 06371
          (860) 434-3060/ Fax (860) 434-9483
          Attorney for Fausto Gonzalez


**CERTIFICATION OF SERVICE**

I certify that I mailed a copy of the within memorandum to the following on July 15, 2005:

Office of the U.S. Attorney
ATT: David Ring, AUSA
157 Church Street 23rd Floor
New Haven, CT 06510

    By_____
        William T. Koch, Jr. Esq.