UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA          Criminal No. 3:02CR007(JBA)

v.

FAUSTO GONZALEZ,          August 3, 2005
     aka "Fast"

### UNITED STATES' RESPONSE TO DEFENDANT GONZALEZ'S MOTION FOR NEW TRIAL

## Introduction

The defendant presently moves the Court for a new trial. His motion revolves around testimony elicited from Santiago Feliciano during redirect examination, in which Feliciano explained that he approached the defendant when he was looking for someone to murder Casiano because the defendant had often bragged about committing murders. The defendant's first argument is that the Court improperly ruled that defense counsel opened the door to this testimony. His second argument is that his counsel was constitutionally ineffective during cross-examination because he opened this door.

The Court properly ruled that the defendant's counsel opened the door to this testimony because counsel's questioning placed into issue the reasonableness of Feliciano's explanation of why he approached the defendant in the first instance. Nonetheless, when counsel inadvertently opened this door, he did not render ineffective assistance. Under the totality of the circumstances, counsel's line of questioning was reasonable, even though the benefit of hindsight shows that this strategy might have been unwise. Accordingly, the

defendant has failed to show a proper basis for a new trial, and his motion should be denied.

## Background

During direct examination, Santiago Feliciano was questioned about his conversations with the defendant, to include the first conversation in which they discussed the murder-for-hire in Connecticut. Feliciano provided the following testimony about his first contact with Gonzalez:

Q:   Did you see anybody when you were there [Cubano]?

A:   Yes, I seen Fausto.

Q:   Did you speak to him?

A:   Yes.

Q:   Why don't you tell us what was said?

A:   I said "Some guys up in Connecticut need you to do a job."

Q:   And by "job," what did you mean?

A:   Killing somebody.

Q:   And what did he say?

A:   He said "When."

Q:   I'm sorry?

A:   "When"

Q:   "When"?

A:   Yes.

Q:   And what did you understand him to mean when he said that?

A:    Whenever.  He was ready.

*        *        *

Q:    Okay.  And actually there is a couple of questions that I should ask as well.  When you met Fausto down at the pizza place and he said, "When," was Mario Lopez present on that occasion?

A:    No, sir.

Q:    And at the time you approached Fausto and had this conversation with him, did you know who he was?  In other words, had you met him before?

A:    Yes, sir.

Q:    And were you friends with him, or was this just another hi, bye?

A:    Hi-bye thing.

Tr. 258-59.

On cross-examination, defense counsel approached this issue in the following

manner:

Q:    Now you've been a cocaine dealer for at least ten years selling cocaine on the street before this murder occurred, right?

A:    Yes, sir.

Q:    And you managed to do that for the better part or more of a decade without even getting arrested, right?

A:    Yes, sir.

Q:    Not even once?

A:    No, sir.

Q:     Now, that's a long time to be selling drugs on the street
       without being arrested, wouldn't you agree?

A:     Yes, sir.

Q:     Because it's a treacherous business?

A:     It was not an every day thing, sir. It was just I was nickle and
       diming.

Q:     The business itself is a difficult business to do without getting
       caught, right?

A:     Yes, sir.

Q:     Because there are informants, people who got arrested looking
       to work their way out of cases? There is a lot of possible
       problems out there on the street, right?

A:     Yes, sir.

Q:     So you have to be careful who you deal with?

A:     Yes, sir.

Q:     You don't know, if you're not careful, whether you are making
       a sale to a police agent, correct?

A:     I don't know, sir. I don't know.

Q:     Well, you were fortunate enough, lucky enough, never to have
       done that, correct?

A:     Yes, sir.

Q:     Because you sized up the people you did business with very
       carefully, right?

A:     Like I tell you, it wouldn't be often, sir. It was like an off and
       on thing.

Q:      *63 grams every couple of weeks, but you were careful not to do business with strangers, right?*

A:      Yes, sir.

Q:      *Because strangers present problems at the street level of criminal activity, right?  That's true?*

A:      Yes, sir.

Q:      *Now, Fausto, never a friend of yours, right?*

A:      It's a hi and bye thing, yeah.

Q:      Sorry?

A:      It's a hi and bye thing, yeah.

Q:      *So, not even an acquaintance of yours, right?*

A:      No, sir.

Q:      *Hi, bye?  And he wasn't involved in any drug selling with you?*

A:      No, sir.

Q:      *Wasn't involved in any stolen motorcycles with you?*

A:      No, sir.

Q:      You understand he had his own stolen motorcycle thing?

A:      Yes, sir.

Q:      *Now, it's true then you really didn't know him at all?*

A:      *I knew him by talk.*

Q:      *Yeah, from the neighborhood, from the pizza place?*

A:      *Yes, sir.*

> Q:     *Right?  You never hung out with him?*
>
> A:     No, sir.
>
> Q:     Did you know if he was married?
>
> A:     No. I knew he had a wife, don't know if he was married.
>
> Q:     Did you know if he had any kids?
>
> A:     Yes.
>
> Q:     How about if he had any health problems, anything like that?
>
> A:     No, sir.
>
> Q:     You didn't know anything about that, right?  You didn't know if he was out on bond on an arrest, nothing like that?
>
> A:     No, sir.
>
> Q:     *So, your story is that you approached a guy you hardly knew to go kill a guy in Connecticut and his only response to you was "When"?*
>
> A:     Yes, sir.

Tr. 316-20 (emphasis added).

During a recess, the United States informed the Court that it wanted ask Feliciano during redirect why he spoke to Gonzalez about the murder, given defense counsel's suggestion that it would have been absurd of him to do so.  Tr. 368-69.  The Court agreed with the Government's position (Tr. 370-72), and the following colloquy occurred with defense counsel:

> Court:    Yes, well the government's asking its question very carefully in order not to get near that testimony.

Counsel:    But it creates the same insinuation.

Court:    Then you go and ask the question that makes it sound as if this is totally made up stuff because it's so illogical in light of all of his other pattern of illegal conduct.

Counsel:    The question was narrow also because it was simply "you had this conversation with this guy and all he says is 'when.'"

Court:    No, you said "So you approached a guy that you hardly knew to go and kill a guy in Connecticut and your whole conversation is 'when.'"

Counsel:    Which is exactly what they established on direct, that he approached a guy he hardly knew.

Court:    Yes, but that's not the point of the question. The point of the question is following exactly on the discussion about selling the cocaine, not being arrested, tried hard not to get caught, very careful who he dealt with, careful not to do business with strangers. He's involved in a hi-bye relationship with the defendant, he hadn't been involved with him, the defendant had his own motorcycle thing, he knew him by talk, he knew he had a wife, kids, didn't know about his health. "So you approach a guy you hardly knew," etcetera. It seems to me the clear inference of that question is that this is not being truthful.

Tr. 372-73. After hearing additional argument, the Court further explained:

Court:    We're nowhere near any of the specific uncharged – unadjudicated murders, but we are right at how come, out of all of the people he has a hi-bye relationship with, even at Cubano pizza, he picks out Fausto, and I agree, it's not 404(b), it's just his explanation for how he comes – he goes to pick him out when he's – and you may

> be right it doesn't – that you can still make the
> argument that this doesn't make any sense, but
> at least it makes more sense than just picking a
> total stranger out of a crowd.

Tr. 376.

After a recess, Feliciano was brought before the Court, without the jury. Tr. 384. He was then asked why he chose to discuss the murder with Gonzalez, and Feliciano (predictably) explained:

> Q:    Why did you chose to discuss the murder with him? Why did
>       you go to him?
>
> A:    Because I knew – I knew him by talk of people.
>
>          *       *       *
>
> . . . Yeah, everybody would brag about what he would do, he
> would kill people.
>
> Q:    And was he himself one of the people that would brag about
>       that?
>
> A:    Yes, sir.
>
> Court:      Did you ever hear him brag?
>
> A:    Yes.
>
> Court:      And what did you hear him brag?
>
> A:    About a murder before that, before Teddy Casiano.

Tr. 384-85. The Court then issued the following limiting instruction to the witness:

> Court:      You can't talk about what other people said, only
>             what you heard yourself from the defendant,
>             and not the specifics of what he said, but just, as

-8-

you said, he bragged about other murders, or something like that.

\*        \*        \*

All right, so you understand you may answer the question as to why you chose to go to Mr. Gonzalez based on what you had heard him say in your presence, but without any specific reference to any specifics.

Feliciano:    Yes, your Honor, "specific" meaning murders[?]

Court:    Specific murders.

\*        \*        \*

In other words, not the – you started to say something about killing a particular person. That is still off limits, okay?

Tr. 385, 386-87.[1]

On redirect the following questioning ensued:

Q:    What I'd like to do is I'd like to go back to that first conversation you had with Fausto Gonzalez in the pizza place in which you asked him about the murder. Do you understand the conversation that I'm asking you about?

A:    Yes, sir.

Q:    Okay. The question I have for you is when you were at the pizza place, you then went to talk to Fausto and asked him to do the job. Why is it that you chose to go to him and ask him whether he would do the job?

---

[1] The Government noted for the record that, because the issue was Feliciano's state of mind, the witness should be allowed to testify about what he heard the defendant say as well as what he heard others say. But, the Government did not take issue with, or object to, the limitations imposed by the Court. Tr. 387.

A:     Because he was always bragging about murders.

Q:     And was he bragging about doing the murders himself?

A:     Yes.

Tr. 403.

## Legal Standard

It is well-settled that motions for new trial are "not favored" and should be granted "only in the most extraordinary circumstances." *United States v. Diaz,* 176 F.3d 52, 106 (2d Cir. 1999); *United States v. Spencer,* 4 F.3d 115, 118 (2d Cir. 1993); *see also United States v. Sanchez,* 969 F.2d 1409, 1414 (2d Cir. 1992) ("discretion [to grant new trial] should be exercised sparingly"); *United States v. Costello,* 255 F.2d 876, 879 (2d Cir. 1958) ("motions for new trials are not favored and should be granted only with great caution").

While this Court is permitted under Rule 33 to weigh the evidence for itself and evaluate the credibility of the witnesses, *see Sanchez,* 969 F.2d at 1413-14, the jury's conclusions are still entitled to considerable deference. *See United States v. Ferguson,* 246 F.3d 129, 133-34 (2d Cir. 2001) ("the courts generally must defer to the jury's resolution of conflicting evidence"). It is only where "exceptional circumstances can be demonstrated" – such as where "testimony is patently incredible or defies physical realities" – "that the trial judge may intrude upon the jury function of credibility assessment." *Sanchez, 969 F.2d at 1414.*

At bottom, "the test is whether it would be a manifest injustice to let the guilty verdict stand." *Sanchez,* 969 F.2d at 1414 (internal quotations omitted); *accord Ferguson,* 246

-10-

F.3d at 133-34. "There must be a real concern that an innocent person may have been convicted." *Sanchez,* 969 F.2d at 1414.

As a subset of his new trial motion, the defendant makes a claim of ineffective assistance of counsel. When evaluating such a claim, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington,* 466 U.S. 668, 689 (1983) . A defendant's *post hoc* accusations alone are not sufficient to overcome this strong presumption, as such a holding would lead to constant litigation by dissatisfied criminal defendants and harm the effectiveness, and potentially even the availability, of defense counsel. *See id.* In light of the presumption in favor of counsel, the threshold for an ineffectiveness claim is extremely high, and courts have "declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox, or downright ill-advised." *Tippens v. Walker,* 77 F.3d 682, 686 (2d Cir. 1996).

To prove a violation of his Sixth Amendment right to counsel based on his counsel's alleged ineffectiveness, the defendant "must meet a difficult two-part test." *DeLuca v. Lord,* 77 F.3d 578, 584 (2d Cir. 1996). He must establish both "(1) that counsel's performance fell below an objective standard of reasonableness, . . . and (2) that there is a reasonable probability that, but for the deficiency, the outcome of the proceeding would have been different." *McKee v. United States,* 167 F.3d 103, 106 (2d Cir. 1999) (quoting *Strickland,* 466 U.S. at 688, 694). The ultimate goal of the inquiry is not to second-guess decisions made by defense counsel; it is to ensure that the judicial proceeding is still worthy of confidence

despite any potential imperfections, as "the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." *Roe v. Flores-Ortega,* 528 U.S. 470, 482 (2000) (quoting *United States v. Cronic,* 466 U.S. 648, 658 (1984)).

In assessing the reasonableness of counsel's performance "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689. Showing merely that there were potential strategic errors or that some decisions were questionable is not sufficient as "[t]here are countless ways to provide effective assistance in any given case." *Id.* In order to prevail on the first prong of the *Strickland* test, therefore, the petitioner must conclusively show that, despite the strong presumption in favor of counsel, "under the totality of the circumstances, [trial counsel] failed to exercise the skills and diligence that a reasonably competent attorney would provide under similar circumstances." *Boria v. Keane,* 99 F.3d 492, 496 (2d Cir. 1996).

Even if the defendant is able to make the difficult showing that his counsel's performance was objectively unreasonable and unprofessional, he still bears the burden of proving that the deficient performance "caused him substantial prejudice." To demonstrate prejudice the petitioner must show "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Hurel Guerrero v. United States,* 186 F.3d 275, 282 (2d Cir. 1999) (quoting *Strickland,* 466 U.S. at 687-88). More than just simple speculation about potential harms caused by counsel's

actions is necessary to support a finding of prejudice. For prejudice to exist, the established and unprofessional errors of counsel must have been "sufficient to undermine confidence in the outcome." *Jackson v. Leonardo,* 162 F.3d 81, 85 n.9 (2d Cir. 1998) (quoting *Strickland,* 466 U.S. at 694).

## Discussion

The defendant argues that the Court erred by ruling that the Government could properly question Feliciano about why he chose to discuss the murder with him. In addition – despite the fact that the defendant argues that *the Court* was wrong to let in this testimony – the defendant also argues that *defense counsel* was constitutionally ineffective when he asked the questions which opened the door to the Government's redirect examination. Thus the defendant makes two irreconcilable arguments: (1) that the Court plainly erred by allowing redirect examination based on defense counsel's cross-examination; and (2) that defense counsel plainly and egregiously erred by asking questions that were doomed to open the door to the challenged testimony.

The defendant's first argument is easily dismissed. On direct examination, the Government asked Feliciano about his first contact with the defendant in regard to the murder. Tr. 258-59. But the Government carefully limited its questions, in order to avoid mention of the defendant's past involvement in murders as well as his boasts of such. Rather, the Government merely established that Feliciano knew Gonzalez, but was not friends with him. Tr. 259. At this point in the trial, the jury was presented with a "black box": they were informed that Feliciano approached Gonzalez about the murder, but they

were told *nothing* about why.  Had this testimony been left alone, the jury may have been left to wonder why Feliciano approached the defendant, but they would have had no further information, and there would have been no reason to delve into it further.

On cross-examination, however, defense counsel made the nature of Feliciano's prior relationship with the defendant a central issue.  First, defense counsel established that Feliciano was a seasoned drug dealer, who was careful and crafty enough to stay away from people whom he did not know.  Tr. 316-18.  Feliciano did this, posited defense counsel, "[b]ecause strangers present problems at the street level of criminal activity[.]" Tr. 318.  Counsel then delved into the fact that Feliciano was not friends with the defendant, and that Feliciano did not know much about him.  Tr. 318-19.  This line of questioning peaked when counsel asked: "Now, it's true then you really didn't know him [Gonzalez] at all?" Tr. 319.  Feliciano responded: "I knew him by talk." Tr. 319.[2] Defense counsel then proceeded to make clear the point of his overarching examination: "So, your story is that you approached a guy you hardly knew to go kill a guy in Connecticut and his only response to you was 'When'?"  Tr. 320.

By the end of defense counsel's cross-examination – unlike the end of the direct – the jury had been presented with the issue of why Feliciano would have approached the defendant to commit the murder, and whether his explanation of these events was

---

[2]  The record is clear that Feliciano had been sternly admonished not to talk about the defendant's other murders.  Tr. 382.  Quite possibly Feliciano was cutting his answer to this question short because of these admonitions and despite defense counsel's apparent invitation for the witness to provide a more elaborate answer.

believable or absurd.  No longer was this part of the story a "black box" to be left alone by the parties, but rather it had become an issue that needed to be examined in order to ensure that the jury was not left with a partial and misleading version of events.  Thus, plainly, the Court was correct when it held that defense counsel had opened the door to follow-up questions regarding why, in fact, Feliciano approached the defendant to discuss the murder.  Tr. 372-76.

While the evidence at issue here was not Rule 404(b) evidence,[3] the Second Circuit has repeatedly held that it is within a trial court's discretion "to admit evidence of prior [404(b)] acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between the participants in the crime developed, or to explain the mutual trust that existed between coconspirators."  *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993) (and cases cited therein).  Here, the challenged testimony precisely fit this bill: the evidence was essential to explain why one conspirator (Feliciano) was willing to approach another coconspirator (the defendant) and trust him.

In *United States v. Panebianco*, 543 F.2d 447 (2d Cir. 1976), the Second Circuit dealt with a situation almost exactly like the one now before the Court.  There, the defendant had made death threats against a witness, and the prosecution avoided these facts throughout

---

[3] The Government was not seeking to prove the underlying truth of the defendant's boasts, but rather the witness's state of mind and belief when he performed certain acts. *See* Tr. 376 (Court ruling that testimony did not implicate Rule 404(b)).  Thus the Government was not trying to prove prior bad acts (*e.g.*, that the defendant was a killer), but only that the defendant made verbal acts (*e.g.*, boasted about committing murders) that were, themselves, relevant to explain associations.

direct examination.  *Id.* at 454-55.  But, on cross-examination, defense counsel asked the witness about an instance when the witness attempted to plant evidence on the defendant, for the purpose of setting him up for arrest.  *Id.*  As a result of this examination, the Government on redirect examination was allowed to inquire about the death threats, in order to explain the witness's conduct, which had been placed in issue by defense counsel.  *Id.* at 455.  The Second Circuit affirmed the trial court's decision to allow this line of follow-up questioning.  *Id.*  In doing so the Court provided clear guidance about when a trial court should allow the Government to delve into controversial matters as a result of defense cross-examination:

> Ordinarily, unrelated death-threat testimony is kept from a jury because its potential for causing unfair prejudice outweighs its probative value with respect to a defendant's guilt.  *However, where cross-examination has been used to elicit an incomplete picture which gives a distorted impression of a witness's credibility, the prosecution should generally be allowed to set the record straight on redirect.*

*Id.* (citations omitted and emphasis added).[4]  Here, as in *Panebianco*, the defense elicited information on cross-examination that created a distorted impression of a witness's credibility.  Thus it was only proper to allow this distortion to be revealed.  *Id.*

---

[4]  This same view was echoed in *United States v. Qamar*, 671 F.2d 732, 736 (2d Cir. 1982).  There, again, the Second Circuit affirmed a trial court's decision to admit testimony of a  defendant's death threats to a Government witness.  As in *Panebianco*, the Court in *Qamar* endorsed the trial court's decision that "any attempt to excise the [death] threat from [the witness's] account of the meeting during which it was made *would result in confusing testimony riddled with suspicious gaps that would cause the jury to doubt [the witness's] veracity.*"  *Id.* (emphasis added).

-16-

In making the claim that the Court erred by allowing the redirect examination, the defendant jumps on the bomb-throwing band wagon that has gathered in this case, and throws into the mix the following claim of misconduct:

> Furthermore, it is our view, that based upon the record, the government's argument lacked credibility. Base [*sic*] upon the statement by Mr. Ring himself during jury *voir dire* on September 22, 2004 at page 678, it is our view that the government was not surprised *but essentially laying in wait so that it could, in effect, force the door open to be able to admit testimony concerning the prior murders.*

Def. Mem. at 14 (emphasis added). The cited *voir dire* passages reveal (1) the Government objecting to a certain line of inquiry by defense counsel *precisely because* such inquiry might open the door to the Government, and (2) the Government alerting the Court to certain door-opening issues. *See* Tr. 678.

The defendant's claim of abuse is noting short of remarkable. In October 2002, the United States provided the defendant with notice of its intent to introduce Rule 404(b) evidence at trial. On August 30, 2004, the defendant filed a motion to preclude the Government from introducing evidence of the defendant's involvement in uncharged murders, including the proffered 404(b) evidence. Doc. #1158. On September 8, 2004, the Government responded to the defendant's motion, and agreed not to introduce the 404(b) evidence. Doc. #1196.[5] Nonetheless, in its pleading, the Government set forth in detail its concern that the defense might open the door to such evidence, and thus the Government

---

[5] Given the Government's representations, the Court denied the defendant's motion as moot. Doc. #1210.

formally alerted both the Court and the defendant to this concern. *See id.* at 3-6. Likewise, during jury selection, as already mentioned, the Government went out of its way to alert the Court and the defendant to the fact that various defense tactics could result in the opening of the door to evidence about the defendant's involvement in these other murders. *See* Tr. 678.[6]

The Government was under no obligation to explicitly state its door-opening concerns, or to alert the defense team in advance to the Government's reasoning as to what acts would cause a door to open. But the Government did so. And it did so repeatedly and explicitly. For this, the Government is now subject to claims that it acted deceitfully and was "lying in wait." It is hard to imagine how the Government's repeated *warnings* to the Court and to defense counsel would amount to "lying in wait." Indeed, were the defendant's argument to be true, the actual proof of the Government's "lying in wait" is that the Government repeatedly set off alarm bells for the defense, alerting the defense to possible areas of doom. In a word, the defendant's claim of misconduct is nothing short of absurd.[7]

---

[6] While not in the present record, it is expected that inquiry of the defendant's prior counsel would reveal that the Government had repeated and extensive discussions with said counsel both prior to and during trial, for the purpose of reducing the risk that defense counsel would unintentionally open a door to evidence regarding the defendant's involvement in uncharged murders.

[7] The logical implication of the defendant's argument is that the Government should provide *less* notice to the defense regarding the Government's door-opening theories. Any shouts of warning, according to the defense, only proves that the Government is greedily anticipating the defense's demise. Surely present counsel would not be suggesting such abstinence in future cases.

The defendant also argues in passing that error occurred when the Government questioned DEA Special Agent Chris Matta about his own shooting abilities. *See* Def. Mem. at 18. Again, this line of inquiry was invited by defense counsel. During cross-examination, Agent Matta was asked about investigative steps that he took to determine which hand the killer used to fire the gun during the murder. The focus of the questioning was not on the substance of what the various witnesses had said during the investigation, but rather on the actions that Agent Matta took (or did not take) in response to that information. *See* Tr. 1197-1202. The examination began with defense counsel asking Agent Matta about whether he had conversations with Mario Lopez before September 17, 2004, about the hand that Gonzalez used to fire the gun. Tr. 1197-98. Then, counsel asked whether Agent Matta had the benefit of the Hartford Police reports, from the time that Agent Matta became involved in the case in 1999. Counsel asked about whether three people testified in the grand jury that the shooter was left handed. Tr. 1198-99. And, counsel asked about the video testimony of Michael Pinheiro that was taken prior to trial. Tr. 1199. The cross-examination then proceeded to confirm that Agent Matta understood that persons claimed to see the shooter use his left hand, before he discussed the shooting-hand with Mario Lopez. Tr. 1199. And counsel confirmed that, before addressing the subject with Lopez, Agent Matta knew that Lopez was left handed. Tr. 1199-1200. Defense counsel followed up by discussing the debriefings of Lopez that occurred after September 17, and confirmed that Lopez vacillated in his recollection over the course of three separate

interviews.  Tr. 1201.  Defense counsel also asked whether, during these interviews, Pinheiro's deposition "[w]as at all on your mind."  Tr. 1202.

One of the upshots of the defense questioning was that Agent Matta had been remiss in not showing more concern for the fact that some witnesses had seen the killer shoot with his left hand.  While defense counsel never asked Agent Matta *why* he did not pursue the matter with Lopez at earlier time, the implication was that *the facts known* to Agent Matta *should have* caused him to pursue the matter earlier.  Thus, the issue – as framed by the defense – was whether the facts known to Agent Matta should have caused him to pursue the matter earlier with Mario Lopez.

It was in direct response to this implication that the Government elicited the following testimony on redirect:

> Q:    Now, yourself, sir, I take it you carry and qualify with handguns?
>
> A:    Yes.
>
> Q:    Did you ever shoot – what hand are you, right handed or left handed?
>
> A:    I'm right handed.
>
> Q:    Ever shoot with your left hand?
>
> A:    Yes.
>
> Q:    Ever have a problem hitting a target six inches away with your left hand?[8]

---

[8] Defense counsel argues that Agent Matta testified "that he personally would have had no problem *shooting and killing a man* from six inches away with his left hand, even though he was right handed."  Def. Mem. at 18 (emphasis added).  This, of course, was not

-20-

A:      No.

Tr. 1209.  Again, once the defense made an issue of what Agent Matta *knew* during the time

he was conducting his investigation, it became proper to explore what other facts Agent

Matta knew at the time.  Perhaps for this reason defense counsel never even objected to this

line of questioning.

The defendant's final argument of ineffective assistance of counsel also must fail.

It is ironic (at best) that defense counsel is strenuously arguing *both* that prior counsel did

nothing wrong during cross-examination (and opened no doors), *and* that prior counsel

was ineffective in asking such questions (because he did open such doors).  Surely the

defendant cannot have it both ways.  The fact that he articulates at great length why he

believes prior counsel's actions were proper is, in itself, proof that prior counsel was not

ineffective.

In any event, aside from the cross-tensions created by the defendant's own

arguments, it cannot be said that defense counsel's cross-examination was constitutionally

deficient.  The Second Circuit has "'repeatedly noted [its] reluctance to second-guess

matters of trial strategy simply because the chosen strategy was not successful.'"  *Cuevas*

*v. Henderson*, 801 F.2d 586, 590 (2d Cir. 1986) (quoting *Trapnell v. United States*, 725 F.2d 149,

155 (2d Cir. 1983)).  "Decisions whether to engage in cross-examination, and if so to what

extent and in what manner, are . . . strategic in nature."  *United States v. Nersesian*, 824 F.2d

1294, 1321 (2d Cir. 1987).  And, such decisions of trial strategy, "if reasonably made, will

---

the testimony.

not constitute a basis for an ineffective assistance claim." *Id.; see Kelly v. United States*, 820

F.2d 1173, 1176 (11th Cir. 1987) ("A strategic decision by defense counsel will be held to

constitute ineffective assistance only if it was so patently unreasonable that no competent

attorney would have chosen it.") (internal quotation omitted).

Here, the record is clear that the defendant's trial counsel questioned Feliciano with

the intent to prove that Feliciano's "story" did not make sense. Such a strategic decision,

under the circumstances, was reasonable. The fact that – with the benefit of hindsight – we

can see that this strategy came with some costs does not mean that "counsel made errors

so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the

Sixth Amendment." *Strickland*, 466 U.S. at 687. Indeed, there are countless cases where

defense counsel pursued a strategy on cross-examination that "opened the door" to a

harmful redirect examination, but where defense counsel was not deem ineffective. *See,*

*e.g., Cuevas*, 801 F.2d at 590 (Counsel opened the door to testimony about a prior photo

identification and thereby harmed the defendant's case, but did not render ineffective

assistance); *Kelly*, 820 F.2d at 1176 ("We agree with the district court that while hindsight

reveals that [defense counsel's] attempted defense may not have been a wise strategy in

light of the testimony subsequently elicited by the government, his strategy was not so

unreasonable that no competent attorney would have chosen it."); *Lopez v. Greiner*, 323 F.

Supp. 2d 456, 480-81 (S.D.N.Y. 2004) (Counsel's "vigorous cross-examination" elicited

"incendiary threats" made by the defendant and "almost certainly" disadvantaged the

defendant before the jury. "But hindsight is notoriously lucid. The Court cannot say . . .

that counsel made errors so serious that he was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment.") (quoting *Strickland*) (internal quotation marks omitted).  Indeed, as trial counsel explained to the Court at the time, it was equally consistent with his defense that Feliciano would not have trusted a person who was a braggart and a stranger to commit a murder in Connecticut, and that, ultimately, the testimony elicited during redirect examination was not devastating.  Tr. 375 ("[B]ut if the guy's testimony is going to be this guy bragged about killing people, it doesn't blunt any of the cross-examination because it still invites the question of would a guy who has been on the street all these years hook himself up with somebody who is a braggard [*sic*].").

Moreover, even if it could be said that defense counsel provided ineffective assistance (and they did *not*), the defendant cannot show "substantial prejudice."  As noted above, to prove prejudice the defendant must show "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *McKee v. United States,* 167 F.3d at 106.  Here, three cooperating witnesses (Berrios, Lopez, and Feliciano) testified that the defendant had agreed to kill Casiano; that he was on the back of the motorcycle used in the murder both before and after the murder; that he possessed the murder weapon; and that the defendant later took credit for committing the murder.  Additionally, a fourth witness (Valentin) testified that the defendant bragged about committing Casiano's murder.  Surely the mere mention of the fact that the

defendant previously bragged about other murders cannot be said to have "led to a guilty verdict," as the defendant now claims. Def. Mem. at 18.[9]

## Conclusion

For the foregoing reasons, the defendant's motion for a new trial should be denied.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


/s/
DAVID A. RING
ASSISTANT U. S. ATTORNEY
157 Church Street
P.O. Box 1824
New Haven, Connecticut   06508
(203) 821-3700
Federal Bar No. CT14362

---

[9] The defendant incorporates without discussion all of the arguments raised by his previous counsel. Def. Mem. at 18. These previous arguments, it appears, do nothing other than challenge a variety of the Court's rulings. Because the Court did not err in any of the challenged rulings, the defendant's incorporated arguments provide no basis for a new trial.

## CERTIFICATION OF SERVICE

      This is to certify that the within and foregoing has been sent via email and first-class mail this 4th day of August, 2005, to:

William Koch
Law Offices
151 Brush Hill Rd.
Lyme, CT 06371


_____/s/_____
DAVID A. RING
ASSISTANT UNITED STATES ATTORNEY