UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 3:02cr07 |
| | : | |
| FAUSTO GONZALEZ | : | |

**RULING ON MOTION FOR NEW TRIAL [Doc. # 1332]**

After conviction on three counts related to defendant's involvement as the shooter in an interstate murder-for-hire, defendant Fausto Gonzalez moves for a new trial under Fed. R. Crim. P. 33.  See Mot. for New Trial [Doc. # 1332]; Mem. in Support [Doc. # 1388].  He argues that the Court erred in admitting the testimony of a cooperating witness that the defendant bragged about committing other unspecified murders, or, alternatively, that defendant's trial counsel was ineffective for opening the door to such testimony.  See Mem. in Support at 8. For the reasons that follow, defendant's motion for a new trial is denied.

I.   FACTUAL BACKGROUND

Defendant was convicted by a jury of conspiring to commit murder-for-hire by means of interstate travel; committing a murder-for-hire by means of interstate travel; and using and carrying a firearm during and relation to a crime of violence, leading to death, all in violation of 18 U.S.C. §§ 1958 and 924. See Jury Verdict [Doc. # 1277].  The Government presented evidence at trial that Gonzalez, a resident of Bronx, New York,

1

was hired at the direction of co-defendant Wilfredo Perez, leader of a cocaine operation in the Hartford area, to kill Teddy Casiano in Hartford in May 1996.

At Gonzalez's trial, a cooperating witness, Santiago "Jay" Feliciano,[1] testified that he was involved in procuring Gonzalez as the hitman to carry out the murder. Feliciano at the time was a small-time, occasional drug dealer who purchased cocaine for resale from Ricky Ruiz, owner of El Cubano pizza restaurant in the Bronx where Gonzalez regularly spent time. Trial Transcript ("Tr."), Vol. II, 10/5/04, at 245. Feliciano testified that he approached Gonzalez at El Cubano about killing someone in Connecticut:

> Q. Why don't you tell us what was said.
> A. I said "Some guys up in Connecticut need you to do a job."
> Q. And by "job," what did you mean?
> A. Killing somebody.
> Q. And what did he [Gonzalez] say?
> A. He said "When."
> Q. I'm sorry?
> A. "When."
> Q. "When?"
> A. Yes.
> Q. And what did you understand him to mean when he said that?
> A. Whenever. He was ready.

Id. at 258. Following up, the Government asked Feliciano about his relationship with Gonzalez:

---

[1] Feliciano pleaded guilty to conspiracy to commit murder for hire in connection with Teddy Casiano's death. Trial transcript, Vol. II, 10/5/04, at 239.

> Q. And at the time you approached Fausto and had this conversation with him, did you know who he was? In other words, had you met him before?
> A. Yes, sir.
> Q. And were you friends with him, or was this just another hi, bye?
> A. Hi-bye thing.

Id. at 259.

On cross-examination, the defendant's attorney elicited the following testimony:

> Q. Now, you had been a cocaine dealer for at least ten years selling cocaine on the street before this murder occurred, right?
> A. Yes, sir.
> Q. And you managed to do that for the better part or more of a decade without even getting arrested, right?
> A. Yes, sir.
> Q. Not even once?
> A. No, sir.
> Q. Now, that's a long time to be selling drugs on the street without being arrested, wouldn't you agree?
> A. Yes, sir.
> Q. Because it's a treacherous business?
> A. It was not an every day thing, sir. It was just I was nickel and diming.
> Q. The business itself is a difficult business to do without getting caught, right?
> A. Yes, sir.
> Q. Because there are informants, people who got arrested looking to work their way out of cases? There is a lot of possible problems out there on the street, right?
> A. Yes, sir.
> Q. So you have to be careful in who you deal with?
> A. Yes, sir.
> Q. You don't know, if you are not careful, whether you are making a sale to a police agent, correct?
> A. I don't know, sir. I don't know.
> Q. Well, you were fortunate enough, lucky enough, never to have done that, correct?
> A. Yes, sir.
> Q. Because you sized up the people that you did business with very carefully, right?

```
A.   Like I tell you, it wouldn't be often, sir.  It
     was like an off and on thing.
Q.   ...[B]ut you were careful not to do business with
     strangers, right?
A.   Yes, sir.
Q.   Because strangers present problems at the street
     level of criminal activity, right?  That's true?
A.   Yes, sir.
Q.   Now, Fausto, never a friend of yours, right?
A.   It's a hi and bye thing, yeah.
Q.   Sorry?
A.   It was a hi and bye thing, yeah.
Q.   So, not even an acquaintance of yours, right?
A.   No, sir.
Q.   Hi, bye?  And he wasn't involved in any drug
     selling with you?
A.   No, sir.
Q.   Wasn't involved in any stolen motorcycles with
     you?
A.   No, sir.
...
Q.   Now, it's true then you really didn't know him at
     all?
A.   I knew him by talk.
Q.   Yeah, from the neighborhood, from the pizza place?
A.   Yes, sir.
Q.   Right?  You never hung out with him?
A.   No, sir.
Q.   Did you know if he was married?
A.   No.  I knew he had a wife, but I don't know if he
     was married.
Q.   Did you know if he had any kids?
A.   Yes.
Q.   How about if he had any health problems, anything
     like that?
A.   No, sir.
Q.   You didn't know anything about that, right?  You
     didn't know if he was out on bond on an arrest,
     nothing like that?
A.   No, sir.
Q.   So, your story is that you approached a guy you
     hardly knew to go kill a guy in Connecticut and
     his only response to you was "When"?
A.   Yes, sir.
Q.   Okay.  And there was no further conversation at
     that point?
A.   No, sir.
```

Id. at 317-20.

At the next recess, the Government argued that the cross-examination of Feliciano had created a misleading impression, which the Government had the right to correct by eliciting previously-avoided testimony concerning why Feliciano sought out Gonzalez:

> MR. RING [GOVERNMENT]: Mr. Casale [Defendant's attorney], much to my surprise, asked this witness questions about when he first met Fausto for the purpose of discussing the murder,.... Mr. Casale has left the jury with the impression that it's completely implausible that Jay would have gone to Fausto under these circumstances.
>     I don't know how I can respond to that other than by asking this witness, "Well, why did you go to this guy that you didn't know." ...
>
> COURT: Well, let's talk about your questioning that I noted, all of the analysis about how he wants to be careful not to deal with strangers, "you haven't been arrested, dealing cocaine for 10 years and you don't deal with strangers, yet you just go down to New York and you didn't even know Fausto and you just go up to him and say, 'Do you want to do a killing?" "You approached a guy you hardly knew to kill a guy in Connecticut and the conversation ends with 'when.'"
>     Why isn't the government entitled to say "Why did you go and ask Fausto?"
>
> MR. CASALE: ... [The Government] established that he didn't really know him.  They established that this guy was selling drugs at the time.  They established that he had no prior record.  It's not so far beyond what the direct was in this case.
>
> COURT: ... I was surprised to hear that question knowing that if [the Government] asked him "then why did you go and pick out Fausto," he'd say "because he's always bragging about killing people," and that, of course, makes perfect sense as to why he would be picked out of not having known him other than in a hi-bye relationship himself.  It seems to me the

5

government's entitled to ask that question.

Id. at 368-71.  The defense attorney continued to assert that his questions only covered the same terrain as the direct examination, id. at 371-72, but the Court rejected that argument:

> COURT: No, but that's where you are wrong because if it was stopped at 'so you just had a hi-bye relationship with him, you weren't involved with him' then we would have been fine.  But then it goes on to say in a very argumen[ta]tive or rhetorical fashion, something that would normally be expected to be in a closing argument.

Id. at 376.

After further discussion, the parties agreed to voir dire Feliciano outside the jury's presence, and Feliciano stated that he chose to discuss the murder with Gonzalez because other people, and Gonzalez himself, "would brag about what he would do, he would kill people."  Id. at 384.  The Court instructed Feliciano that he could testify to what he heard himself from the defendant, but not what others said, and "not the specifics of what was said," meaning the details of particular murders.  Id. at 385. With those limitations, the following testimony was elicited on redirect examination:

> Q.   Now, sir, Mr. Casale asked you a number of questions about how well you knew the defendant in this case, Fausto Gonzalez, back right before the murder.  I take it you recall hearing some of those questions?
> A.   Yes, sir.
> Q.   All right.  And I think it would be fair to say you testified that it was hi, bye; is that correct?
> A.   Yes.
> Q.   What I'd like to do is I'd like to go back to that

>       first conversation you had with Fausto Gonzalez in
>       the pizza place in which you asked him about the
>       murder.  Do you understand the conversation I'm
>       asking you about?
> A.    Yes, sir.
> Q.    Okay.  The question I have for you is when you
>       were at the pizza place, you then went to talk to
>       Fausto and asked him to do the job.  Why is it
>       that you chose to go to him and ask him whether he
>       would do the job?
> A.    Because he was always bragging about murders.
> Q.    And he was bragging about doing the murders
>       himself?
> A.    Yes.

Id. at 402-403.

Defendant, now represented by new counsel, argues that the Court erred in deciding that his trial counsel had opened the door to this damaging redirect testimony.  In the alternative, defendant argues that his trial counsel was ineffective for opening the door.

## II.  STANDARD

### A.  New Trial

Rule 33 of the Federal Rules of Criminal Procedure, which permits the Court, upon defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires," allows "'broad discretion... to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.'" United States v. Ferguson, 246 F.3d 129, 133 (2d Cir. 2001) (quoting United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992)).  "In exercising the discretion so conferred, the court is entitled to weigh the evidence and in so doing evaluate

for itself the credibility of witnesses." Sanchez, 969 F.2d at 1413 (internal quotation marks and citation omitted). Nonetheless, in evaluating the witnesses' testimony:

> ... the judge must examine the totality of the case. All the facts and circumstances must be taken into account. An objective evaluation is required. There must be a real concern that an innocent person may have been convicted. It is only when it appears that an injustice has been done that there is a need for a new trial 'in the interest of justice.'

Id. at 1414 (emphasis added).

### B.    Ineffective Assistance of Counsel

A defendant alleging ineffective assistance of counsel must meet a two-part test. "First the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." Strickland v. Washington, 466 U.S. 668, 687 (1984). Thus, "the defendant must show that counsel's representation fell below an objective standard of reasonableness" measured "under prevailing professional norms." Id. at 688. "Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance, and a court may not use hindsight to second-guess counsel's tactical choices." McKee v. United States, 167 F.3d 103, 106 (2d Cir. 1999) (internal citations and quotation marks omitted).

To meet the second prong, "the defendant must show that

[counsel's] deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Strickland, 466 U.S. at 687.  "In evaluating the prejudice component of Strickland, a court must determine whether, absent counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different.  Unlike the performance determination, the prejudice analysis may be made with the benefit of hindsight."  McKee, 167 F.3d at 106-07 (internal citations and quotation marks omitted).

**III. DISCUSSION**

   **A.   Door Opening**

At the end of Feliciano's direct testimony, the jury had heard that Feliciano and Gonzalez had a scant passing acquaintance because they had seen each other before at El Cubano pizza shop, and that Feliciano just approached Gonzalez about committing a murder on behalf of "some guys in Connecticut," to which Gonzalez's replied, "When?"  This testimony may well have left the jury wondering why Feliciano would have approached Gonzalez, thus undermining the punch of the Government's evidence of defendant's immediate and chilling response: "When?"  The Government carefully avoided eliciting testimony about Gonzalez's past braggadocio about committing murders, or any details of

9

other uncharged murders said to have involved Gonzalez, which would have explained the reason for Feliciano's approach, as well as the likelihood of defendant's response as Feliciano testified.

Defense counsel could have avoided focusing on what caused Feliciano to approach Gonzalez for the job, but he chose to focus, not unreasonably, on this cooperating witness' credibility. After a series of questions about Feliciano's street savvy, counsel turned to the issue of how little Feliciano knew Gonzalez, establishing that Gonzalez was "never a friend of" Feliciano's, and "not even an acquaintance of yours, right?" Tr. 318. His line of questioning reached its climax when counsel asked, with incredulity, "So, your story is that you approached a guy you hardly knew to go kill a guy in Connecticut and his only response to you was 'When'?" Id. at 320.

The jury previously had no evidence about why Feliciano approached Gonzalez or what he knew about him, and could have been left with the impression that Feliciano's testimony should be discredited as simply the invention of a crafty, street-wise drug dealer looking for a break on his sentence.

Under such circumstances, the prosecution was fairly entitled to rebut this impression. "The general rule,... and one that is eminently logical, is that an impeached witness may always endeavor to explain away the effect of a supposed inconsistency by relating whatever circumstances would naturally

remove it." United States v. Cirillo, 468 F.2d 1233, 1240 (2d Cir. 1972). For example, in Cirillo a witness was impeached on cross-examination by evidence that he had failed to mention certain meetings with the defendant in furtherance of a drug conspiracy when he previously gave statements to narcotics agents. Id. Outside the presence of the jury, the witness explained that he had not mentioned the meetings before because he feared the defendant would kill him if he did, and he had been told by another conspirator that the defendant had connections in law enforcement who would report back to the defendant if the witness informed on him. This testimony then was permitted to be given to the jury, which the Second Circuit held to be proper explanation of the apparent gap in the witness' statements to the agent. Id.

Following Cirillo, the Second Circuit held in United States v. Panebianco, 543 F.2d 447, 455 (2d Cir. 1976), that "where cross-examination has been used to elicit an incomplete picture which gives a distorted impression of a witness's credibility, the prosecution should generally be allowed to set the record straight on redirect." There, a cooperating witness was asked on cross-examination about planting drugs on an individual named Clark for the police to find. Id. at 454. On redirect, "the government was allowed to clarify this matter by eliciting" the witness' explanation that Clark and one of the defendants had

11

twice threatened to kill her if she did not sell a package of drugs, so she planted the drugs to get Clark arrested. Id. at 455. The Second Circuit held this testimony admissible after defense counsel "had attempted to impeach [the witness] by harping on her having framed Clark," because "the evidence of the threats served to rehabilitate the witness by supplying a justification for her actions at the time." Id.

In this case, the cross-examination of Feliciano left the jury with the improbable testimony that Feliciano had just selected Gonzalez for this heinous job without any particular basis, inconsistent with the implied portrayal of him as a cagey criminal who knew better than to deal with strangers. Having this door opened, the government then was entitled to rehabilitate its witness by filling in the picture with an explanation of the reasons for Feliciano's choice of Gonzalez. See United States v. Rosado, 728 F.2d 89, 95 (2d Cir. 1984) (holding that once defendants opened door to an issue, they "cannot complain that the Government was permitted to present some evidence of its side of this issue."); Panebianco, 543 F.2d at 455; Cirillo, 468 F.2d at 1240.[2]

---

[2] United States v. Beno, 324 F.2d 582 (2d Cir. 1963), relied on by defendant, is distinguishable because the challenged evidence there lacked the focused purpose and narrowness of the government's rebuttal evidence in the instant case. In Beno, the district court admitted character evidence concerning the defendant's community reputation for honesty from witnesses who, it turned out, lacked sufficient personal knowledge of the

The admission of Feliciano's testimony that Gonzalez bragged about committing other murders, in the context of the substantial evidence of defendant's guilt in this case, does not create a "real concern that an innocent person may have been convicted." Sanchez, 969 F.2d at 1414. Defendant therefore is not entitled to a new trial on this basis.

**B.    Ineffective Assistance of Counsel**

"[I]n most cases a motion brought under [28 U.S.C.] § 2255 is preferable to direct appeal for deciding claims of ineffective-assistance." Massaro v. United States, 538 U.S. 500, 504 (2003). The Second Circuit also has "often noted our own 'baseline aversion to resolving ineffectiveness claims on direct review.'" United States v. Wellington, 417 F.3d 284, 288 (2d Cir. 2005) (quoting United States v. Salameh, 152 F.3d 88, 161 (2d Cir. 1998)). This general rule stems from the problem that "[w]hen an ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for

---

matter. In response, the government was permitted to initiate mini-trials into five unrelated bad acts, collateral to the bribery charge at issue. The Second Circuit held that no rule of evidence "suggests that once a defendant has offered irrelevant and incompetent evidence on certain specific facts, the prosecution is immediately entitled to explore without restraint and at great length any specific occurrence which might tend to create an abhorrent image of the defendant." Id. at 588.

this purpose." Massaro, 538 U.S. 504-05. However, an ineffective assistance claim may be heard on direct appeal where the defendant is "represented by new counsel on direct appeal and the ineffective assistance claim [i]s based solely on the record developed at trial." See United States v. Leone, 215 F.3d 253, 255-56 (2d Cir. 2000) (citations and quotation marks omitted).

Defendant Gonzalez is now represented by new counsel, following trial counsel's request to withdraw for unrelated reasons. See Sealed Motion, Order Granting Sealed Motion, and New Attorney Appearance [Docs. # 1330, 1338, 1402]. His claim of ineffective assistance by trial counsel is based solely on the trial record of Feliciano's cross-examination, and the colloquy accompanying the testimony, requiring no further factual development. Therefore the Court will address it without awaiting a petition for habeas corpus under 28 U.S.C. § 2255.

The Court rejects the conclusion that by opening the door to Feliciano's testimony about why he chose Gonzalez, defense counsel "failed to exercise the skills and diligence that a reasonably competent attorney would provide under similar circumstances." Boria v. Keane, 99 F.3d 492, 496 (2d Cir. 1996). "[T]he conduct of examination and cross-examination is entrusted to the judgment of the lawyer," and a court "should not second-guess such decisions unless there is no strategic or tactical justification for the course taken." United States v.

14

Luciano, 158 F.3d 655, 660 (2d Cir. 1998) (per curiam), cert. denied, 526 U.S. 1164 (1999), reversed on other grounds, United States v. Luciano, 311 F.3d 146 (2d Cir. 2002); see also United States v. Eisen, 974 F.2d 246, 265 (2d Cir. 1992), cert. denied, 507 U.S. 1029 (1993) ("Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature."). For example, in Cuevas v. Henderson, 801 F.2d 586, 590 (2d Cir. 1986), "defense counsel 'opened the door' to the introduction of identification evidence damaging to [defendant's] defense when he asked [the arresting officer on cross-examination] whether any photographs had been shown to the victim...." On redirect, the prosecutor elicited testimony that the victim had identified the defendant's picture from a photo array. The court wrote that "[w]ith the benefit of hindsight it is clear that the introduction of testimony concerning the photo identification hurt rather than helped [defendant's] case." Id. However, it appeared that defense counsel had asked the question strategically to "blunt the force" of the victim's testimony that she later identified the defendant in a lineup, by suggesting that the lineup was tainted by the previous photo identification procedure. Id. Even more similar to the present case, defense counsel in Cuevas also asked the officer on cross-examination whether the defendant had a weapon when he was arrested. "On redirect, the prosecutor then elicited

testimony... that [defendant] was arrested in the criminal court building, assertedly to explain why Cuevas had no weapons when he was arrested." Id. Although defense counsel did not believe his question would open the door to a suggestion that the defendant had other pending criminal charges, the Court of Appeals held that "[i]t was not unreasonable for counsel to try to show that [defendant] did not carry" the knife used in the crime when he was arrested. Id. at 590-91.

Here, trial counsel's attempt to impeach the credibility of this cooperating witness was clearly strategic, particularly since the government's case was largely based on the testimony of cooperating witnesses. In objecting to the government's redirect examination, counsel reflected his tactical reasons for asking Feliciano questions about his relationship with Gonzalez, which also included his belief that Feliciano's redirect testimony might not be particularly harmful. First, counsel stated that based on the previous testimony, "I don't think this would come as a big surprise at this point," meaning that, given all the evidence of drug dealing, motorcycle stealing and other misdeeds in which the co-defendants and cooperating witnesses were involved, the jury would not be surprised to learn that Gonzalez had bragged about committing other crimes. Tr. 375. Second, counsel explained that Feliciano's testimony "doesn't blunt any of the cross-examination because it still invites the question of

16

would a guy who has been on the street all these years hook himself up with somebody who is a braggar[t]."  Id.  Third, defense counsel argued, and the Court agreed, that even though the door had been opened to the testimony about Gonzalez's bragging, the opening was not "anywhere near" large enough to permit evidence of specific uncharged crimes, which would have been substantially more prejudicial.  Id. at 375-76.

It is evident that counsel knew, from the briefs on the motion to exclude evidence of uncharged crimes at the penalty phase, filed more than a year prior to trial, see [Doc. # 502], what Feliciano's testimony would be, and therefore counsel could plan his cross-examination accordingly, with full information. See United States v. Gonzalez, No. 3:02cr07 (JBA), 2004 WL 1920492 (D. Conn. Aug. 17, 2004), at *2 (Government proffered that "Santiago Feliciano also will testify that Gonzalez bragged about the Munoz murder soon after it occurred.").  It is also evident, especially in light of his closing argument, that counsel's primary concern was impeaching the credibility of Feliciano and the other cooperating witnesses, in the face of a prosecution case built almost entirely on cooperator testimony. Under these circumstances, counsel's decision to conduct an aggressive cross-examination of Feliciano and impeach him with the implausibility of his approaching Gonzalez to commit a murder, is readily seen as a strategic choice falling fully

17

within the range of reasonable competence.

"[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 446 U.S. at 689 (internal quotation and citation omitted). Defendant fails to make that showing here, and thus it is unnecessary to examine the question of prejudice. Defendant is not entitled to a new trial on the grounds of ineffective assistance of counsel.

### C. Other Claims

Defendant also states without elaboration in his memorandum of law that he "incorporates each and every argument set forth" in the motion for a new trial dated January 28, 2005, and "each and every legal memorandum and argument by counsel during voir dire and trial in support of the arguments set forth" in the same motion. Def. Mem. in Support of Mot. for New Trial at 18. The January motion [Doc. # 1332] was merely a list of claims, unsupported by a memorandum and filed before the trial transcripts had been prepared.

Under this District's local rules, "[a]ny motion involving disputed issues of law shall be accompanied by a written memorandum of law...." D. Conn. L. Civ. R. 7(a)(1); D. Conn. L. Crim. R. 1(c) (applying Civil Rule 7(a) to criminal cases).

Because defendant has not provided any analysis as to the grounds for these itemized contentions, most of which appear to have been previously addressed in rulings by the Court, the Court will not address them further here.

**IV. CONCLUSION**

For the foregoing reasons, defendant's motion for a new trial [Doc. # 1332] is denied in its entirety.

                              IT IS SO ORDERED.

                                    /s/

                              _____
                              JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, December 5, 2005.**